FILED
CLERK, U.S. DISTRICT COURT

October 12, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VPC___ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMPLETE MEDICAL SALES, INC., <br><br> Plaintiff/Counter-Defendant, <br><br> v. <br><br> GENORAY AMERICA INC., <br><br> Defendant/Counter-Claimant. | Case No. 8:20-cv-01277 <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

    This case principally involves the alleged breach of contract between a manufacturer of medical diagnostic equipment, Defendant and Counter-Complainant Genoray America, Inc. (Genoray), and its former distributor, Plaintiff and Counter-Defendant Complete Medical Sales, Inc. (CMS). Genoray has brought a counterclaim for breach of contract. The Court held a bench trial in this case. After evaluating the evidence at trial and weighing credibility, the Court issues the findings of fact and conclusions of law as set forth below.

1

**CMS COMPLAINT**

1.  Genoray is a manufacturer of a C-Arm, a medical imaging device, including the Zen-7000. CMS is a medical sales company.

2.  On July 25, 2013, Genoray and CMS entered into a distribution agreement that gave CMS the exclusive right to distribute the Zen-7000 in the United States for a five-year term (Agreement). At the end of the original term, the parties agreed that the Agreement would be "reviewed" to consider an additional five-year term. In ruling on Genoray's motion for partial summary judgment, this Court rejected CMS's claim that the Agreement was subject to "automatic renewal." Dkt. No. 78, at 6-7. The Agreement also allowed either party to terminate the Agreement in the event of a default that was not cured within 90 days of notice of the default.

3.  The Agreement has two attachments, the letter of intent that preceded the Agreement and the dealer policy. The dealer policy specifies that all Genoray products are covered under a standard one-year limited warranty. "According to this policy, Genoray will provide parts and Dealer will provide labor to any customers who's having trouble within [the] initial warranty period. Genoray will make effort to send all needed parts to Dealer via express shipping." Ex. B to Agreement. "Dealer is responsible for collecting, repairing, and returning defective parts."

4.  The Agreement also contains an option provision that granted CMS "a first option to be the exclusive distributor for any subsequent generation or iterations of the [Zen-7000]," subject to certain terms and conditions. Genoray subsequently developed a C-arm that it called the "Oscar 15."

5.  After entering into the Agreement, the parties had a cooperative business relationship for most of the five-year term and attempted to amicably resolve issues that arose. Genoray periodically experienced issues with the Zen-7000 and sought to address them; and CMS regularly worked with Genoray to resolve the resulting problems to satisfy the affected customers. CMS experienced issues with meeting the sales volume commitments under the Agreement; and Genoray regularly worked with

CMS to adjust those commitments or make other accommodations to allow for continued exclusivity.

6. In this lawsuit, CMS claims that Genoray breached the product warranty on 38 sales dating back to 2013. K. Orlando Decl. ¶¶ 153-419. CMS contends that these warranty breaches "crushed [its] business and irreparably harmed its reputation, eventually causing CMS to go out of business." K. Orlando Decl. ¶ 451. For this claim of business destruction, CMS seeks: (a) unpaid wages for Tony and Kristin Orlando for the years 2018, 2019, and 2020 in the total amount of $809,237.96; (b) unreimbursed loans from the Orlandos to CMS in the amount of $1,312,244.62; (c) shipping and freight costs incurred by CMS between November 10, 2017 and April 9, 2020 in the amount of $175,323.94; (d) automobile expenses incurred by CMS between November 12, 2017 and March 30, 2020 in the amount of $10,960.40 and 25% of the automobile expenses incurred by CMS between January 2013 through December 2017 in the amount of $51,744.79, for a total of $62,705.19; (e) employee training costs for the period of June 6, 2018 through June 24, 2019 in the amount of $11,747.83; (f) commissions and fees paid to CMS salespersons C-Arm sales between January 5, 2017 and May 26, 2020 in the amount of $309,762.26; (g) advertising and marketing expenses between December 13, 2017 and March 19, 2020 in the amount of $6,736.17, 25% and advertising and marketing expenses between January 13, 2013 and December 2017 in the amount of $118,619.91; and (h) travel expenses between January 2013 and December 2017 in the amount of $92,088.02; and (i) parts warranties paid to Genoray in the amount of $460,000 on the theory that Genoray "did not honor the vast majority of the warranties." K. Orlando Decl. ¶¶ 453-85.

7. In claiming more than $3.4 million in business expenses over a period of several years, CMS contends that it incurred these costs as a result of the breach of warranty on all 38 sales. CMS seeks consequential damages on a theory that requires a finding of breach of warranty with respect to each sale at issue. As its counsel conceded during closing argument, CMS did not provide damage evidence on a sale-

by-sale basis, and there is no way for the Court to determine damages arising out of each purported breach.[1]

8.   While there were admitted problems with the product at times, CMS has not demonstrated a breach with respect to all these sales. Genoray disputes the facts, and disclaims fault and responsibility, on many of the 38 sales. While Genoray was responsible for a number of the problems associated with the sales at issue, the Court does not find that CMS has demonstrated a breach in each instance. Indeed, CMS has fallen far short of such a showing: there were instances when Genoray was at fault and fixed the problem consistent with its obligations; and there were other instances when CMS or the customer was partially or wholly responsible. Thus, CMS has failed to demonstrate the claimed breaches.

9.   The breach of warranty claim fails for another reason: CMS has not shown that the alleged breaches caused the broad scope of damages claimed in this lawsuit. The Court is not persuaded that the alleged breaches, even if accepted, caused the claimed damages. CMS has not convincingly shown that the alleged breaches "crushed" its business causing it to incur the extent of damages claimed. The evidence presented was exaggerated. Prior to the litigation, the parties had a cooperative relationship and worked together to solve customer problems irrespective of the party at fault (i.e., Genoray, CMS, or the customer). As Dave Orlando wrote in the fall of 2018, the CMS "Service Department works together with the Genoray service department handling customer complaints and finding resolutions." Ex. 158, at 146. The Court finds that Genoray was generally responsive and tried to remedy the issues that arose and did not cause the extent of damages sought in this lawsuit.

---

[1] In closing argument, CMS's counsel suggested that the Court could take a percentage approach. For example, if the Court concluded that Genoray breached the warranty in 50% of the sales at issue, the Court could take 50% of the total damages sought. The Court rejects this approach as an unreliable method of demonstrating damages that arose out of specific alleged breaches. Among other problems, this approach assumes that each alleged breach produced a similar amount of damages.

10. More generally, the Court did not find the testimony offered by CMS to be credible and reliable. The CMS witnesses appeared to be advocates who aggressively pursued positions most advantageous to the Orlandos, including extreme claims of wrongdoing and damages.[2] At trial, CMS portrayed Genoray as a terrible company that—throughout their business relationship—consistently produced defective products, provided poor customer service and technical support, and tarnished CMS's reputation, among other harmful things. This long history of alleged wrongdoing, the Orlandos argued, ultimately "crushed CMS'[s] business." K. Orlando ¶ 451.

11. Yet much of the history of the relationship between the parties appeared amicable, cooperative, and mutually beneficial—so much so that CMS strongly desired to maintain the relationship and distribute Genoray products. Attempting to bridge the gap between their contemporaneous business actions and subsequent portrayal of the facts in litigation, the Orlandos testified at trial that they remained hopeful throughout their relationship that Genoray would do better and thus continued to do business. The Court does not find the explanation credible. The Orlandos exaggerated the problems attributed to, and harm caused by, Genoray to such an extent that the Court finds that it generally cannot rely on them whenever there was a dispute in the evidence.

12. CMS next claims that Genoray breached the exclusivity provision in their contract. The Court previously ruled on summary judgment that the contract did not contain an automatic renewal provision. At trial, CMS offered another theory—not presented in opposition to the summary judgment motion—for asserting exclusivity. According to CMS, the parties continued to operate under the Agreement

---

[2] The Court similarly found CMS witness Frank Borst to be partial to the Orlandos and unreliable.

5

1 | after its expiration, resulting in an implied contract on the same terms and conditions,
2 | including a new five-year exclusivity period.

3 | 13. Michigan law recognizes two types of implied contracts—a contract
4 | implied in law and a contract implied in fact. 5A Mich. Civ. Jur. Contracts § 229. A
5 | contract *implied in law* is a legal fiction imposed by a court requiring payment for
6 | benefits received to avoid an injustice. *Id*. It is in all material respects a claim of
7 | unjust enrichment. *Id*. A contract *implied in fact* is an agreement reached by the
8 | parties as evidenced by their words or actions. *Id*. It is in all material respects a claim
9 | of breach of an actual contract that embodies a meeting of the minds. *Id*.; *see also*
10 | *Innotext, Inc. v. Petra'Lex USA Inc.*, 694 F.3d 581, 594 (6th Cir. 2012) ("[A]n
11 | 'implied *in law*' claim differs from an 'implied *in fact*' contract. An implied-in-fact
12 | contract still requires mutual assent to the essential terms of the contract, but is
13 | evidenced by the parties' course of dealing.").

14 | 14. CMS has not pleaded a claim for breach of a contract implied in fact. It
15 | has pleaded instead a claim for breach of an express contract (i.e., the Agreement) in
16 | Count I and a claim for unjust enrichment in Count IV. A claim for unjust enrichment
17 | is the equivalent of a claim for breach of a contract implied in law. *Id*.; *see also*
18 | *Innotext*, 694 F.3d at 594. Because CMS did not allege a breach of a contract implied
19 | in fact, it cannot raise this new claim at trial. *See Galicia v. Country Coach, Inc.*, 324
20 | F. App'x 687, 689 (9th Cir. 2009) (upholding a lower court's denial of leave to amend
21 | and add new claims eight days before trial because such amendments would be unduly
22 | prejudicial so close to trial). By raising this claim so late, CMS deprived Genoray of
23 | the ability to move for summary judgment on this theory and otherwise to properly
24 | prepare for this last-minute claim.

25 | 15. But even if the Court were to consider this untimely asserted claim, CMS
26 | still would not be able to prove it on the facts elicited at trial. "As a general rule, an
27 | implied agreement arises when a written contract expires by its terms and the parties
28 | continue to perform as before." *Cloverdale Equip. Co. v. Manitowoc Eng'g Co.*, 964

F. Supp. 1152, 1162 (E.D. Mich. 1997), *aff'd*, 149 F.3d 1182 (6th Cir. 1998). The "continued performance gives rise to a rebuttable presumption that the parties were bound by an implied agreement with terms the same as those set forth in the expired contract." *Wirt v. Ticona Polymers, Inc.*, No. 04-73753, 2006 WL 2660607, at *9 (E.D. Mich. Sept. 14, 2006) (citing *Cloverdale*, 964 F. Supp. at 1162 and *Paxson v. Cass Cnty. Rd. Comm'n*, 38 N.W.2d 315, 310 (Mich. 1949)). *But see Iverson Indus., Inc. v. Metal Mgmt. Ohio, Inc.*, 525 F. Supp. 2d 911, 918-19 (E.D. Mich. 2007) (concluding that there is a "permissible inference" rather than a "presumption").[3] Under Michigan law, this rule applies when the factual circumstances "show a mutual intention to contract." *Cloverdale*, 964 F. Supp. at 1161 (citation and quotation omitted).

16.  Significantly, Michigan law does not impliedly create agreements that do not exist. That is, an agreement will be implied in fact only when the words or actions of the parties express such agreement. *Id.*; *see also Iverson Indus.*, 525 F. Supp. 2d at 919 ("[T]o create or modify a contract, there must be a meeting of the minds."). On the other hand, "if the evidence suggests contrary intentions, a contract does not necessarily continue and is not implicitly renewed." *Iverson Indus.*, 525 F. Supp. 2d at 917 (citing *Howell Elec. Light & Power Co. v. Village of Howell*, 92 N.W. 940, 941 (Mich. 1903) (stating that continued performance may imply an intent to renew, but "[i]f there be anything to show a contrary intention, the renewal of the contract for the stated period will not be inferred")); *see also* 5A Mich. Civ. Jur. Contracts § 231 ("When negotiations for a contract are pending, the law will not conclude them by any presumptions of an implied contract.").

17.  In this case, the parties clearly had not agreed by words or actions to renew the Agreement for another five-year term. The original five-year term of the

---

[3] This Court need not decide whether continued performance gives rise to a permissible inference rather than a rebuttable presumption because CMS's claim fails under both standards.

7

Agreement expired on July 25, 2018. That same year, the parties were attempting to negotiate the terms of a contract extension, and Genoray offered terms that were materially different, including exclusivity only on the Zen-7000 and only through the end of 2019. *See, e.g.*, Ex. 12. CMS did not agree to the offer and instead engaged in negotiations. *See, e.g.*, Ex. 13. Those negotiations did not result in an agreement, and the discussions between the parties indicate that they disagreed fundamentally on the term and scope of an extension. Indeed, CMS recognizes this fact in its complaint. CMS alleged that when the "Agreement was nearing an end . . . , [Genoray] continuously tried to force [CMS] to waive its exclusivity rights" and "also attempted to limit the automatic 5-year extension of the agreement to only a 1-year extension." Compl. ¶¶ 48-50; *see also* Compl. ¶ 56 (alleging that Genoray was attempting to negotiate a new agreement).

18. In these circumstances, the Court cannot find that the parties impliedly agreed to another five-year term—or any renewed term for that matter. The facts rebut any presumption that this was the mutual intention of the parties; and to force such terms on Genoray would be contrary to its expressed intent and contrary to Michigan law. *See Iverson Indus.*, 525 F. Supp. 2d at 518-19.

19. CMS also contends that Genoray breached another term in the Agreement—the option provision. In Section 10 of the Agreement, the parties provided:

> Genoray hereby grants to CMS, a first option to be the exclusive distributor for any subsequent generation or iteration[] of the Products . . . in the Territory. Upon development of such New Products, Genoray shall promptly notify CMS, and CMS shall have the opportunity to review and evaluate such New Products, and determine whether it desires to distribute such New Products subject to mutually agreeable terms between CMS and Genoray. CMS shall have thirty (30) days to exercise its option; in the event CMS declines such right, or fails to exercise its rights within the thirty (30) day period, Genoray may directly, or indirectly, through the use of other distributors promote, market and sell such New Products in the Territory.

Ex. 6 at 3. The parties did not offer any extrinsic evidence about the meaning of this provision. The Agreement was drafted by counsel for CMS.

20. Genoray developed the Oscar 15, a flat panel C-Arm. At trial, Genoray did not seriously contest the fact that the Oscar 15 was a "subsequent generation" of the Zen-7000, triggering the option in Section 10 of the Agreement. Genoray's counsel essentially conceded this point in closing argument.

21. Under Section 10, CMS had 30 days to exercise its option to be the exclusive distributor of the Oscar 15. Section 10 fixes the event that triggers the 30-day period—namely, Genoray's notification of the development of the new product along with the opportunity to review and evaluate it.

22. Genoray notified CMS of the development of the Oscar 15 in May 2016. Genoray also provided CMS with detailed drawings and specifications and requested its feedback on the product, price competitiveness, and potential market penetration. Ex. 9. Genoray explained that the Oscar 15 would have greater functionality than the Zen-7000, and that Genoray expected to submit the Oscar 15 for FDA review by early 2017 with an anticipated launch date in June 2017. Ex. 9.[4] CMS did not exercise its option within 30 days of this notification and opportunity to review the Oscar 15.

23. At trial, CMS contended that the May 2016 notification did not trigger the 30-day option period because the Oscar 15 was not *completely* developed by then. In closing argument, counsel for CMS could not pinpoint when product development had been completed but offered that "it was certainly by July 2017," when Genoray applied for FDA approval of the Oscar 15. In support of this interpretation of Section

---

[4] Kristin Orlando noted that much of the information provided to CMS was written in Korean. But it appears that at least Jae Perez-Kim, a CMS employee, was able to evaluate the information. Ex. 9, at 1-3 (evaluating the product). In any event, CMS has not shown that there was an impenetrable language barrier that prevented its review and evaluation. Presumably, CMS would have sought a translation if it was interested in evaluating the new product.

9

10, CMS's counsel argued that CMS could not be expected to decide whether to exercise its option until there was "complete" development of the product.

24. CMS's argument is legally flawed and factually unsupported. Legally, CMS has not demonstrated that the parties mutually intended that the new product be "complete" before the option period would commence. The language the parties chose to use in Section 10 is "[u]pon development," not "[u]pon [complete] development."[5] It is true, however, that the parties did not specify the requisite state of development. To the extent that this omission renders Section 10 ambiguous, the reasonable interpretation of this provision is that the product had to be sufficiently developed to allow for meaningful review and evaluation for purposes of determining whether CMS wished to distribute the product exclusively.

25. Under this interpretation, CMS has not factually shown that the Oscar 15 was insufficiently developed in May 2016 to allow it to decide whether to exercise its option. CMS provided little evidence at trial about the state of development of the Oscar 15 in May 2016—and no reliable evidence that the product was insufficiently developed to allow CMS to make a determination about whether it wanted to pursue exclusivity.

26. CMS's counsel argued that the development of the Oscar 15 was "complete" by the time that Genoray applied for FDA approval. But even if this is true, CMS failed to show the difference in the state of development between May 2016 (when it received notification of the development) and July 2017 (when the product was submitted for FDA approval). That is, CMS did not show that (a) the product had undergone significant development between May 2016 and July 2017 and (b) the Oscar 15 was not developed enough in May 2016 to allow for meaningful

---

[5] Nor does the introduction of the word "complete" render the interpretation of Section 10 clear. A new product can be expected to undergo changes after it is developed and even after it is launched. The point at which the product has reached "complete" development is not self-evident.

review for purposes of deciding whether to exercise the option.  The two principal witnesses involved in reviewing the Oscar 15 for CMS—Dave Orlando and Jae Perez-Kim (see Ex. 9)—did not testify at trial.

27.  Thus, the Court finds that CMS provided notice and an opportunity to review the Oscar 15 in May 2016.  CMS did not exercise its option within 30 days of that notification, and CMS failed to show that the Oscar 15 was insufficiently developed to conduct a meaningful review to make an informed decision.  During that 30-day period, CMS did not communicate an interest in exclusively distributing the new product, commence any discussions about such an interest, suggest that it did not have enough information to determine whether it had an interest, or request an extension of the 30-day period.

28.  Even if the Oscar 15 were not sufficiently developed until July 2017, CMS has not proven a breach of the Agreement because it did not present any reliable evidence of when, if ever, it exercised its option.  CMS's counsel acknowledged in closing argument that his client never formally exercised its option and argued instead that CMS adequately communicated its intent to exercise its option through the words and actions of Dave Orlando.  The problem with this argument is twofold.

First, the evidence of communications between the parties about the option was sparse, disputed, confusing (at times), and ultimately insufficient to conclude that Genoray breached the Agreement.  The parties disputed the contents of the discussions between Dave Orlando and Genoray about exclusivity to distribute the Oscar 15.  And as late as January 7, 2019, Dave Orlando, responding to a proposed Addendum to the Agreement, communicated to Genoray that he believed that CMS had "the right of first refusal" but that "[CMS] would be open to possibly considering a non-exclusive arrangement on the Oscar series." Ex. 156.  A few months later, Dave Orlando, in the context of continued negotiations over a distribution contract, stated: "[W]e would like to work with you [Genoray] and give you the flexibility that you desire with the Oscar 15 product . . . ." Ex. 13.  While there are facts suggesting

11

that CMS at points expressed an interest in obtaining the exclusive right to sell the Oscar 15 and that Genoray was resisting, the evidence was insufficient to enable the Court to determine whether the parties were posturing during negotiations or expressing legally operative contractual positions.[6]

Second, the purported exercise of the option occurred after the Agreement had expired in July 2018. Based on the evidence at trial, the Court does not believe that CMS communicated an intent to exercise its option before the fall of 2018, and the parties did not seriously discuss any terms about such exclusivity before then. In fact, the parties appeared to discuss exclusivity for the Oscar 15 in earnest in the fall of 2018—after the expiration of the Agreement. CMS prepared a business plan for a meeting with Genoray in October 2018 attended by David Orlando for CMS and Eugene Oh and Chris Yoon for Genoray. CMS has not shown that the parties mutually intended that the option granted in Section 10 was to survive the expiration of the Agreement.

29. Even if CMS were able to establish a breach of Section 10 of the Agreement, CMS has not demonstrated that it suffered the damages it claims as a result. It appears that CMS had serious internal problems that impeded its ability to operate profitably, and it ultimately ceased doing business.

30. On March 17, 2020, Tony Orlando notified Genoray that his brother, Dave Orlando, left CMS to work for a competitor, stating: "Unfortunately Dave is now selling a competitive product which is very disheartening for me . . . ." Ex. 170. In that same letter, Tony Orlando stated that he would be assuming his brother's role as the person "in charge of C arms" and claimed to have "many leads and dealer

---

[6] Dave Orlando was a key figure in the discussions about the option, and he did not testify at trial. Kristin and Tony Orlando were not directly involved in the relevant communications with Genoray, and the Court does not believe it can rely on their hearsay reports of what had occurred in evaluating the weight of the evidence.

opportunit[ies]" that would result in an increase in sales. *Id*. He also claimed that CMS's "financial status has been steadily improving." *Id*.

31. Less than one month later, Tony Orlando sent Genoray a letter claiming a breach of contract and stating that "[CMS] simply cannot continue to sell [Genoray's] defective and unsupported products to customers as that will cause our damages to skyrocket." Ex. 171. According to CMS, "the defects with the Zen 7000 and Oscar 15 are so significant that we have had multiple customers demand full refunds for the products and threaten additional action against us." *Id*.

32. The Court is not convinced that CMS would have profitably sold the Oscar 15 on an exclusive basis. It appears that CMS was experiencing significant internal problems, particularly the loss of Dave Orlando. Dave Orlando was the key figure in the C-Arm operations for CMS. Tony Orlando, on the other hand, had relatively high-level involvement, as was evident from his testimony. When his brother left the company, Tony Orlando purported to step into his critical operational role and acknowledged that Genoray might be "skeptical of [CMS's] capabilit[ies]." Ex. 170. Less than 30 days later, CMS announced that it would discontinue selling Genoray products. Ex. 171.

33. CMS suggested that there was no cause and effect between Dave Orlando's leaving the company and the decision to discontinue the business. While the Court does not conclude that there is a perfect causal relationship between these two events, it does find that CMS was not forthright at trial about the true and likely significant effect of the loss. CMS, a small company, lost a key figure who had significant knowledge about the products, the business, and the overall operations and who had substantial relationships with dealers, potential customers, and other relevant industry participants. And CMS did not just lose this key figure, it had to face him as a competitor selling a competing product in the same market.

34. In his letter to Genoray, Tony Orlando described the departure of his brother from the company to sell a competitor's product as "very disheartening" for

him. Ex. 170. At trial, Tony Orlando blamed the departure on Genoray, testifying that his brother left because he was "extremely frustrated with the issues [CMS was] having with the Genoray product." Like much of the evidence presented by CMS, this testimony appears to be exaggerated. Dave Orlando worked to continue the business relationship with Genoray. While Dave Orlando may have periodically expressed frustration with product issues, the Court does not find credible that he left the family business to sell a competitor's product as a result.

35. CMS also claimed that Genoray's products and service, including both the Zen-7000 and Oscar 15, were so fundamentally flawed that CMS would sustain losses (not profits) by selling the products. Although the Court finds this claim to be exaggerated for litigation purposes, the evidence CMS introduced to support its position taints its showing of lost profits. CMS has not demonstrated that it would have been successful in distributing the Oscar 15 without the alleged breaches, let alone that it would have achieved the level of profitability suggested by its damages expert. The Court therefore finds that CMS has not proven its damages claim even if it could show a breach of Section 10.

36. In summary, the Court finds that CMS failed to establish that Genoray breached the exclusivity provision in their contract (Count I), breached the warranty on the alleged 38 sales (Counts II & V), or was unjustly enriched (Count IV).[7] There is one conceded breach, however. Genoray admitted that while the Agreement was in effect, it sold one Zen-7000 device to KPI Ultrasound, Inc. on December 27, 2016 during the exclusivity period.[8] Ex. 138. As Genoray concedes this breach and did not

---

[7] Count III of CMS's complaint was dismissed with prejudice by stipulation of the parties on June 30, 2020. Dkt. No. 13.

[8] CMS contends that Genoray did not prove that the other four Zen-7000 devices sold during the term of the Agreement to World Wide Medical were pursuant to the exclusivity carve-out in the Agreement. *See* Ex. 6 (permitting Genoray to continue selling to World Wide Medical "for the purpose of collecting and reducing outstanding account balances owed to Genoray"); Ex. 138 (noting four Zen-7000 devices sold by Genoray to World Wide Medical from 2015 to 2016). But CMS errs

appear to object to the proffered damages by Patrick O'Keefe for the purposes of this one sale, the Court finds that Genoray breached the Agreement and caused $13,566.50 in damages to CMS.

**GENORAY COUNTERCLAIM**

37. In its counterclaim, Genoray claims that CMS breached their agreement by failing to pay for 6 devices and 16 extended warranties. K. Min Decl. ¶¶ 8-62.

38. Genoray sold four Zen-7000 devices—purchase orders 71616, 71741, 71768, and 71797—between October 21, 2019 and January 24, 2020 for which CMS has failed to pay. Ex. 150; K. Min. Decl. ¶¶ 8-15, 24-49. Genoray sold these four Zen-7000 devices for a total of $240,900, and has not been paid any of the outstanding balance for these devices. Genoray further sold two Oscar 15 devices to CMS— purchase orders 71729 and 71939—on December 26, 2019 and March 18, 2020, respectively. Ex. 150; K. Min. Decl. ¶¶ 15-23, 50-57. Genoray sold both Oscar 15 devices for a total of $148,000, and CMS has only paid $7,900 to Genoray. K. Min. Decl. ¶ 21. Thus, Genoray has not been paid the outstanding balance of $140,100 for the two Oscar 15 devices sold to CMS.

39. Genoray also sold CMS 16 warranties at $6,000 per warranty. Ex. 152; K. Min. Decl. ¶¶ 58-62. CMS has not paid for any of these 16 warranties, thus Genoray has not been paid an outstanding balance of $96,000.

40. The Court finds that Genoray agreed to sell these 6 devices and 16 warranties for a total of $484,900, and that CMS agreed to pay for them. CMS has

---

in placing the burden of proof on Genoray—it is CMS that is claiming breach of the Agreement, and thus its burden to demonstrate that Genoray did not sell devices to World Wide Medical for purposes of reducing their debt obligation. 23 Williston on Contracts § 63:14 (4th ed.) ("The plaintiff or party alleging the breach has the burden of proof on all of its breach of contract claims."); *see also* 3A Mich. Pleading & Prac. § 36:242 (2d ed.) ("If the plaintiff asserts a breach of contract, the plaintiff bears the burden to prove a breach or nonperformance of the contract on the part of the defendant . . . .").

15

breached its agreements by failing to pay its outstanding balance of $477,000, causing damages to Genoray in the amount of $477,000.

41. In its Amended Proposed Findings of Fact and Conclusions of Law, Genoray asserted for the first time an additional $215,750 in damages for outstanding customer and labor warranties. Dkt. No. 104-1 ¶ 72. In a trial declaration, Genoray claimed that it was "forced to incur the additional liability and expense associated with those warranties in order to preserve its reputation and relationship with customers." K. Min Decl. ¶ 65. Because Genoray did not plead these damages in its counterclaim, it cannot recover these damages alleged on the eve of trial. *See Galicia*, 324 F. App'x at 689.

42. In short, the Court finds that CMS breached its agreements to pay Genoray for the 6 devices and 16 warranties Genoray sold to CMS, and that CMS's affirmative defenses are without merit. Genoray, however, failed to timely plead the additional $215,750 in damages it sought at trial, and thus is not entitled to their recovery. CMS therefore owes Genoray its outstanding balance of $477,000 in damages.[9]

## DISPOSITION

The Court will enter a judgment separately.

Dated: October 12, 2021

Stanley Blumenfeld, Jr.
United States District Judge

---

[9] The Court ruled on various objections at trial. None of the rulings affects the decision in this case. That is, even if the Court were to consider all the objectionable testimony offered by CMS, the findings and conclusions would be the same. And in reaching its decision, the Court has not relied on any of the evidence to which CMS has lodged written objections.